IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| U.S. BANK NATIONAL ASSOCIATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | Case No. 4:14CV570 |
| | § | |
| GRAYSON HOSPITALITY, INC. et al. | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER AND REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Pending before the Court are Plaintiff's Request for Appointment of Temporary Receiver (Dkt. 2) and Plaintiff's Application for Injunctive Relief (Dkt. 34). Having heard the arguments and considered the evidence presented at the September 18, 2014 and December 16, 2014 hearings before the Court, the Court finds that the motions should be GRANTED in part and DENIED in part.

U. S. Bank National Association (U.S. Bank) seeks a receivership as to certain properties ("Properties") owned by Defendants Grayson Hospitality, Inc., Texoma Hospitality, Inc., Atoka Hospitality, Inc., KRN Enterprises, Inc., McAlester Hospitality, Inc., and Norman Hospitality, Inc. and managed by Premier Hospitality, Inc., which is affiliated through ownership with Defendants. U.S. Bank also seeks an injunction seeking the return of approximately $8.3 million transferred by Defendants to an affiliated company over the course of the last few months.

The Properties are primary collateral for repayment of six commercial real estate loans held by U.S. Bank in the aggregate original amount of $28,000,000. Approximately $19,000,000 in

1

principal is still due under the original notes. The maturity date for the notes is in August 2015. Defendants are not in principal payment default, but, as conceded by Defendants' counsel, are in default under a strict interpretation of the loan documents. The default has occurred because two of the six hotels have lost their franchise to operate and now are operating under different names. Norman Hospitality, Inc. has lost its Holiday Inn franchise flag and Atoka, Inc. has lost its Best Western franchise flag.

At the September 18, 2014 hearing, the bank's proposed receiver indicated that he had viewed all six Properties and all Properties needed additional capital and immediate maintenance. At the hearing, Rajendra Patel, Defendants' President and Chief Executive Officer, testified that he was attempting to obtain refinancing and needed some additional time. The Court recessed the hearing for an additional three months.

In the intervening three-month period, U.S. Bank has posted the two Texas Properties for foreclosure twice and then — quite inexplicably — failed to foreclose, even though the two Texas borrowers, according to Defendants' counsel, did not object to the foreclosure.

The Properties identified by legal description contained in Exhibits 1-A through 1-F of Plaintiffs' Verified Original Complaint are hotels. *See* Dkts. 1-1 – 1-6. Two hotels are in Texas, and four are in Oklahoma. All six loans are cross-defaulted and cross-collateralized, such that "each of the Security Instruments shall constitute security for each of the Notes as if a single blanket lien in an aggregate amount of the original principal sum noted above were place on all of the Properties

as security for the Notes."[1]

There is no dispute that two of the hotels have lost their "flag sponsorship." As noted, two of the Oklahoma Properties had their franchise agreements terminated. In addition, U.S. Bank asserts that to get these properties up to franchise standards will require significant additional capital which Defendants are apparently unwilling to commit. As argued at the December 16, 2014, hearing, at least two of the other hotels in Texas have received letters indicating that their respective franchise agreements are in jeopardy.

Each individual loan is cross-defaulted and cross-collateralized with all of the loans, such that (i) a default under any particular loan is a simultaneous default under the other loans; and (ii) Property that secures repayment of a particular loan simultaneously secures repayment of all of the other loans. The cross-default and cross-collateralization provisions are consistent with U.S. Bank's reliance on the combined value of the Properties in the aggregate being greater than the value of the sum of the individual Properties. Section 4.34 of the Mortgages and Section 5.34 of the Deeds of Trust, which are identical, provide as follows:

> "[Borrower] acknowledges that [Plaintiff] has made the Aggregate Loan to the [Borrowers] that are a party to each of the Security Instruments upon the security of their collective interest in the [Properties] and in reliance upon the aggregate of the [Properties] taken together being of greater value as collateral security than would be the case if the loans evidenced by each of the Notes were allocated among the [Properties] and recovery as against the Property and each of the Other Properties were limited to the amount so allocated. [Borrower] agrees that the Aggregate Debt is and will be cross-collateralized and cross-defaulted with each other so that (I) an event of default under any of the Aggregate Loan Documents shall constitute an Event of Default under this [Mortgage / Deed of Trust]

---

[1] Section 4.34 of the Oklahoma mortgages (*see* Dkts. 1-3 – 1-6) and Section 5.34 of the Texas Deeds of Trust (*see* Dkts. 1-1 – 1-2).

and the Note; (ii) an Event of Default under this [Mortgage / Deed of Trust] or the Note shall constitute an event of default under the other Aggregate Loan Documents; and (iii) each of the Security Instruments shall constitute security for each of the Notes as if a single blanket lien in the aggregate amount of $28,000,000.00 were placed on all of the Aggregate Property as security for the Notes."

Dkts. 1-1 – 1-2 at §5.34; 1-3 – 1-6 at §2.2.

Further, Section 1.30(b) of each Mortgage provides that in no event shall the Franchise Agreement[2] be terminated without the prior written consent of Plaintiff, and that the applicable Borrower shall comply with all of its duties and obligations under the Franchise Agreement. *See* Dkts. 1-1 – 1-6 at §1.30(b). Section 2.2 of each Mortgage provides that the termination of the Franchise Agreement, that is not replaced with another Franchise Agreement acceptable to Plaintiff, shall, in Plaintiff's sole discretion, constitute an Event of Default under the Mortgage. *See* Dkts. 1-1 – 1-6 at §2.2.

On July 30, 2014, U.S. Bank sent the Norman borrower a Notice of Default and Intent to Accelerate. On August 21, 2014, U.S. Bank sent an Acceleration Letter to all borrowers demanding payment, accrued interest, and other amounts due under the loans. As stated, U.S. Bank also has submitted evidence that the hotels not in default are operated in a deficient manner including damaged rooms, and that there is an overall decline of the Properties.

U.S. Bank requests that the Court appoint a temporary receiver. Federal courts "ha[ve] the power to appoint a receiver to take possession of [a debtor's] property for preservation under Federal Rule of Civil Procedure 66." *Santibanez v. Wier McMahon & Co.,* 105 F.3d 234, 241 (5th Cir.

---

[2] **"Franchise Agreement"**, as defined in Section 1.1(rr) of each Mortgage, means the franchise agreement pursuant to which the applicable Borrowers has the right to operate the hotel located on its Property under a name and/or hotel system controlled by the franchisor. *See* Dkts. 1-1 – 1-6 at §1.1(rr).

1997). Further, "[t]he appointment [of a receiver] is in the sound discretion of the court." *Id.* (citations omitted). Likewise, "the form and quantum of evidence required on a motion requesting the appointment of a receiver is a matter of judicial discretion." *Id.* (citations omitted). In deciding whether to appoint a receiver, courts consider the following factors: a valid claim by the party seeking the appointment; the probability that fraudulent conduct has occurred or will occur to frustrate that claim; imminent danger that property will be concealed, lost, or diminished in value; inadequacy of legal remedies; lack of a less drastic equitable remedy; and likelihood that appointing the receiver will do more good than harm. *Id.* Further, "where the appointment of a receiver is sought at the commencement [of the suit] ... [t]he decision will be made on the basis of the moving papers and such answers, affidavits in opposition, or counter-affidavits as may be offered, and also on the testimony of witnesses in open court if the court deems such a hearing advisable." *Id.* (citation omitted).

U.S. Bank also seeks an injunction ordering Defendants to return and refrain from further transfer of funds from accounts which secure the repayment of their loans. A preliminary injunction is an "extraordinary remedy." *Texans for Free Enter. v. Tex. Ethics Comm'n,* 732 F.3d 535, 536 (5th Cir. 2013). A court may grant an application for a preliminary injunction "only if the movant establishes (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Id.* at 536–37 (quoting *Byrum v. Landreth,* 566 F.3d 442, 445 (5th Cir. 2009)).

Based on the testimony, evidence, and argument presented, as well as the concession of Defendants' counsel, Defendants are in default. U.S. Bank also contends that approximately $8.3 million held by Premier's owners should be held for the benefit of the loan. The owners dispute this.

In response to Plaintiff's request for injunctive relief, Patel, in an unsworn declaration, states that this sum represents what his counsel characterized at the December hearing as "sweat equity." *See* Dkt. 40 at 16-20. He claims that the transferred funds, to which U.S. Bank objects, are funds that did not originate after the loan dates. Defendants contend that the sum of $7.9 million dollars was pledged to the development of new properties. Defendants have attached to their response to Plaintiff's application for injunctive relief several Assignment of Deposit Accounts dating back to 2007. *See* Dkt. 40. Currently, approximately $4.4 million in deposit accounts are assigned to First United Bank and Trust Co. The collateral referenced are two CDs in the approximate aggregate amount of $1.7 million.

Since 2007, Defendants have assigned or pledged CDs with First United ostensibly to develop additional properties. Most of these assignments have matured, except for the two aforementioned CDs. The matured CDs no longer pledged to First United total approximately $6.9 million and, although not clear in the record, represent a portion of the monies transferred to Premier.

At least prior to the last few months, the Court is satisfied that Defendants were using the "sweat equity" as a means to expand hotels. The question is whether the various loan documents they agreed to allowed them to do so. Nothing in the Assignment of Rents prohibits the use of the equity money. However, the Security Agreements do give U.S. Bank a security interest in all deposits. *See* Dkts. 1-1 – 1-6 at §§ 1.6-1.8, 1.21. Thus, the money deposited with First United over

the years is subject to U.S. Bank's lien. This begs the question why U.S. Bank or its predecessors in interest never objected over the last several years. The various agreements give U.S. Bank and its predecessors unfettered access to the borrower's books.

The Court is cognizant of the fact that Defendants contractually agreed to a receivership in the event of default. Such a recital is not binding on the Court but is one of the equities to be considered. *See Riverside Props. v. Teachers Ins. & Annuity Ass'n of Am.*, 590 S.W.2d 736, 738 (Tex. Civ. App.— Houston [14th Dist.] 1979, no writ). Therefore, a contractual obligation made knowingly weighs in favor of granting the receivership. U.S. Bank does have a valid claim, and Defendants are in default. However, the Court views the default as a "technical one" given that the borrowers have complied with most all the agreements found in the 65 page Security Agreement for each of the Properties.

In considering the probability of fraudulent conduct, U.S. Bank argues that deposits have been transferred from Defendants in the last few months. The sum of the monies transferred according to U.S. Bank is over $8 million. U.S. Bank has a security interest in these proceeds. However, not all the proceeds are needed to protect U.S. Bank's interest. Defendants have continued to pay all principal and interest as it becomes due. The Court is not clear on how any income in excess of the principal payments is being applied to bring the Properties into compliance. It appears that little is being done. Therefore, there is the potential for fraudulent conduct, or at least for negligent conduct, in running these Properties. This also favors the consideration of a receivership.

There is evidence that the Properties have diminished in value, but how much is certainly unclear. According to Defendants, U.S. Bank was originally less than candid on its appraisals;

however, Defendants have not rebutted U.S. Bank's position that the value of the Properties has declined.

A competent hospitality receiver could begin making repairs to bring the Properties into a better overall condition. The Court is not convinced, however, that the Properties will significantly diminish in value. The current valuation is near the principal owed, and the Court can fashion relief without the appointment of a receiver to protect U.S. Bank's interest.

Another consideration is the inadequacy of legal remedies. A damage award could make U.S. Bank whole, particularly if the Court can fashion relief to protect its interest. As the Court first noted at the September hearing, if U.S. Bank is so concerned as to its interests in the Properties, it can merely foreclose. This factor weighs in favor of Defendants.

The Court must also consider whether the appointment of a receiver will do more harm than good. U.S. Bank argues that an experienced receiver would bring the Properties up to franchise condition. The Court does not doubt that the receiver will do a better job than Defendants at this time, but at what expense? An appointment of a receiver will likely increase the expenses incurred by all parties and jeopardize possible refinancing. At least as to the Texas Properties, foreclosure is less expensive and less time consuming and is a remedy U.S. Bank has twice elected and then voluntarily cancelled. Simply put, the Court is stumped as to why U.S. Bank would favor an expensive receivership over a mere foreclosure, unless it desires to push its receivership fees on Defendants rather than simply foreclosing and paying costs out of its own pocket. The Court further finds that appointing a receiver might jeopardize Defendants' ability to refinance.

U.S. Bank could foreclose on the Properties and, in fact, has twice posted one of the Properties for foreclosure. This would certainly be a less drastic measure than receivership.

Having considered all of the *Santibanez* factors, the Court finds that a receivership is not necessary if U.S. Bank's interests are adequately protected. To avoid a receivership, Defendants are directed to deposit the sum of $6 million in the Registry of the Court. This represents a significant portion of the funds transferred within the last few months. This is money in which U.S. Bank has an interest, and U.S. Bank has offered sufficient evidence indicating that the transfer violates the Security Agreements. U.S. Bank may then proceed to foreclose on the Properties if it desires. The appraised values of the Properties, and the sum of $6 million adequately protect U.S. Bank's interest against any shortfall.

In addition, Defendants should be enjoined from transferring any further deposits to any third parties, including those currently on deposit with First United, without further order of the Court. Because Defendants have conceded a technical default, Plaintiffs have satisfied their burden in showing a likelihood of success on the merits. The Court finds that immediate and irreparable injury, loss, and harm will result to Plaintiff if funds in Defendants' accounts that relate to the Properties are further dissipated, and injunctive relief is immediately necessary to preserve the *status quo* with regard to the preservation of the value of the Properties. Plaintiffs have satisfied their burden in showing that the Loans are under-secured, and because the Properties and related personal property are Defendants' sole assets, Plaintiff has no adequate remedy at law absent the injunctive relief issued herein. The threatened loss to Plaintiff outweighs any harm to Defendants, and the injunction will not disserve the public interest. Other than for operating expenses, Defendants

should be immediately enjoined from transferring any funds from the accounts that relate to the Properties, absent further directive from the Court.

The sum of $6 million should be deposited with the Court no later than **January 16, 2015**, and Defendants shall file a notice in this matter upon the deposit of same. Failure to do so will result in the recommendation, for the reasons set forth herein, that the receivership be granted on the terms sought by U.S. Bank.

The Court therefore recommends that Plaintiff's Application for Injunctive Relief (Dkt. 34) should be GRANTED in part and Defendants should be enjoined from transferring any further deposits to any third parties, including those currently on deposit with First United, without further order of the Court. Further, Plaintiff's Request for Appointment of Temporary Receiver (Dkt. 2) should be DENIED without prejudice if Defendants deposit $6 million into the Registry of the Court no later than January 16, 2015. If Defendants fail to deposit $6 million into the Registry of the Court by January 16, 2015, then there is no less drastic equitable or legal remedy that will protect Plaintiff's interest and Plaintiff's Request for Appointment of Temporary Receiver (Dkt. 2) should be GRANTED.

Within fourteen (14) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(C).

A party is entitled to a *de novo* review by the district court of the findings and conclusions contained in this report only if specific objections are made, and failure to timely file written objections to any proposed findings, conclusions, and recommendations contained in this report shall

bar an aggrieved party from appellate review of those factual findings and legal conclusions accepted by the district court, except on grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *Id.; Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 22nd day of December, 2014.**

_____
DON D. BUSH
UNITED STATES MAGISTRATE JUDGE